UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

---

RICKY DAVIS,

        Plaintiff,

v.

JOHN KAST,

        Defendant.

Case No. 1:12-cv-677

Honorable Robert Holmes Bell

**REPORT AND RECOMMENDATION**

This is a civil rights action brought by a former state prisoner, through counsel, under 42 U.S.C. § 1983. The only remaining claim is against Corrections Officer John Kast, for alleged discrimination against plaintiff on account of his sexual orientation, in violation of the Equal Protection Clause of the Fourteenth Amendment. Specifically, plaintiff asserts that Kast caused him to be removed from his prison public-works job on account of his sexual orientation. Plaintiff seeks an award of damages.[1]

An earlier version of this case, brought by plaintiff *in pro per*, was dismissed by the District Court for failure to state a claim upon which relief can be granted. The Sixth Circuit reversed on appeal, holding that plaintiff's allegations were sufficient to make out an Equal Protection Claim. *Davis v. Prison Health Services*, 679 F.3d 433 (6th Cir. 2012). After remand, the Prison Law Clinic at Michigan State University Law School undertook plaintiff's representation.

---

[1] Plaintiff's complaint also contains claims under the Americans With Disabilities Act and the Rehabilitation Act of 1974, but these claims do not pertain to Kast, the only remaining defendant.

His counsel dismissed the earlier case without prejudice and filed the present action on plaintiff's behalf.

Discovery has now closed, and defendant Kast has moved for summary judgment. Plaintiff opposes the motion. District Judge Robert Holmes Bell has referred this matter to me for all pretrial purposes, including the entry of a report and recommendation on dispositive motions. 28 U.S.C. § 636(b)(1)(B). I conducted a hearing on defendant's motion on November 15, 2013. Plaintiff was represented by Daniel Manville, Esq., Director of the Prison Law Clinic, and law student Kimberly Barclay, admitted to practice pursuant to W.D. Mich. LCivR 83.1(h). Ms. Barclay presented her client's position professionally and persuasively. Defendant was represented by Assistant Attorney General Cori Eve Barkman.

After review of the record and the submissions of the parties, I conclude that plaintiff's proofs are inadequate to establish an equal protection violation and recommend that defendant's motion be granted. The factual allegations that the Court of Appeals found adequate to state a claim are not supported by evidence.

**<u>Applicable Standard</u>**

Summary judgment is appropriate when the record reveals that there are no genuine issues as to any material fact in dispute and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *Griffin v. Hardrick*, 604 F.3d 949, 953 (6th Cir. 2010). The standard for determining whether summary judgment is appropriate is "whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Kinds v. Ohio Bell Tel. Co.*, 724 F.3d 648, 652 (6th Cir. 2013)

(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). The court must consider all pleadings, depositions, affidavits, and admissions on file, and draw all justifiable inferences in favor of the party opposing the motion. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Entertainment Productions, Inc. v. Shelby Cnty., Tenn.*, 721 F.3d 729, 733 (6th Cir. 2013).

When the party without the burden of proof seeks summary judgment, that party bears the initial burden of pointing out to the district court an absence of evidence to support the nonmoving party's case, but need not support its motion with affidavits or other materials "negating" the opponent's claim. *See Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 787 (6th Cir. 2000); *see also Minadeo v. ICI Paints*, 398 F.3d 751, 761 (6th Cir. 2005). Once the movant shows that "there is an absence of evidence to support the nonmoving party's case," the nonmoving party has the burden of coming forward with evidence raising a triable issue of fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To sustain this burden, the nonmoving party may not rest on the mere allegations of his pleadings. FED. R. CIV. P. 56(e); *see Everson v. Leis*, 556 F.3d 484, 496 (6th Cir. 2009). The motion for summary judgment forces the nonmoving party to present evidence sufficient to create a genuine issue of fact for trial. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir. 1990); *see Santiago v. Ringle*, 734 F.3d 585, 589 (6th Cir. 2013). "A mere scintilla of evidence is insufficient; 'there must be evidence on which a jury could reasonably find for the [non-movant].'" *Dominguez v. Correctional Med. Servs.*, 555 F.3d 543, 549 (6th Cir. 2009) (quoting *Anderson*, 477 U.S. at 252); *see Srouder v. Dana Light Axle Mfg., LLC*, 725 F.3d 608, 613 (6th Cir. 2013).

## Proposed Findings of Fact

The facts appearing of record, viewed in a light most favorable to plaintiff, reveal the following.

### A. Parties

At all relevant times, plaintiff was an inmate at the Florence Crane Correctional Facility in Coldwater, Michigan. Defendant John Kast served as corrections officer at that prison. He supervised inmates assigned to the Public Works Program at the prison, pursuant to which inmates performed work at parks, cemeteries, and other public places outside prison walls. Plaintiff had been assigned to this program, under Officer Kast's supervision, for approximately two weeks before the incident occurred on which this lawsuit is based. Plaintiff asserts that during this period, Kast verbally abused him with derogatory comments aimed at plaintiff's sexual orientation, such as "piggy wiggy," "faggot" and "black homosexual." (Davis Dep. at 69, ID# 382). Plaintiff asserts that Kast used these and other offensive names in front of other prisoners. (*Id.* at 70-71, ID# 383). The affidavit of a fellow inmate avers that Kast used "derogatory names with inmates almost every day, such as gay, bitches, assholes and dickheads." (Green Aff., ID#s 390-91). Although Kast denies these allegations, they are supported by testimony and must be accepted as true for purposes of summary judgment practice.

### B. Plaintiff's Medical Condition

For approximately three years preceding 2009, plaintiff had been a borderline diabetic. (Davis Dep. at 15, ID# 381). Sometime in the year 2009, he was first diagnosed as an insulin-dependent diabetic. (*Id.*). In September or October of 2009, plaintiff applied for a position

in the Public Works program. About two weeks later, he was interviewed by Sgt. DeKlein, who told him that he was eligible and could start in approximately one week. (Davis Dep. at 23-24, ID# 266-67). Plaintiff was not able to begin his new job right away, however, because of problems with high blood sugar. (*Id.* at 25, ID# 268). Ultimately, plaintiff underwent a medical examination by a physician's assistant, who told him that he was cleared to start the work crew. (*Id.* at 29-30, ID#s 272-73).

Plaintiff's medical records indicate that he was indeed undergoing significant problems with diabetes in the fall of 2009.[2] On October 9, 2009, Physician's Assistant Margaret Ouellette found that plaintiff's diabetes was only in "fair control." (ID# 415). Three days later, Dr. Raymond Gelabert increased plaintiff's insulin because of his blood-sugar levels. (ID# 419). On October 15, 2009, plaintiff reported to Casey Bastien, R.N., that he needed to see the doctor because his diabetes was running "very high." (ID# 424). On October 15, 2009, Nurse Anita Griffin saw plaintiff on account of his complaints concerning high blood sugar. The next day, October 16, 2009, plaintiff reported to the nurse that he did not want to take his psych medications, because he believed that they were the cause of his rising blood sugar. The nurse told him that this was "doubtful," because hyperglycemia is not a common side effect of psychotropic medications. (ID# 425).

Plaintiff reported to the medical office for an unscheduled visit on October 17, 2009, because his blood sugar level was 403. (ID# 426). He was back the next day, because his blood sugar level was up to 535. (ID# 429). In a note dated October 21, 2009, P.A. Ouellette described plaintiff as suffering from "uncontrolled" type II diabetes, noting that his glucose level was greater

---

[2] Plaintiff's medical records are found at docket # 74, filed under seal because of their confidential nature.

than 500 over the weekend. She counseled him concerning his diet, noting that his diabetes was "in poor control." (ID# 434).

A medical record notation indicates that plaintiff failed to appear at an appointment established with the dietician to discuss a diabetic diet, because plaintiff was out on a Public Works assignment. The date of the record is October 23, 2009. (ID# 436). The dietician noted that plaintiff appeared to be "noncompliant" because of "store food consumption." (ID# 437).

On October 27, 2009, plaintiff was seen by P.A. Ouellette. His blood sugar was still high, and plaintiff was reporting blurred vision and that his muscles were "locking up." The P.A. attributed this to lactic acid build-up from the glucophage. (ID# 439). Two days later, the dietician reported that plaintiff still complained of blurry vision and muscles locking up. (ID# 441).

By November 3, 2009, plaintiff was still complaining of muscle cramps and vision problems. P.A. Ouellette noted that plaintiff's diabetes was improving, but that he continued to suffer from lactic acid build-up. (ID#s 443-44).

P.A. Ouellette performed a complete work-up on November 4, 2009, including a review of plaintiff's medication. (ID#s. 445-48). On November 19, 2009, P.A. Ouellette discontinued plaintiff's use of a glucophage, because his lactic acid level was still elevated. Plaintiff asked for a referral to the eye doctor because of blurred vision. The P.A.'s notes describe plaintiff's diabetes as "not controlled." As requested, the P.A. ordered an eye examination to address plaintiff's complaints of blurred vision. (ID#s 450-51).

On November 25, 2009, P.A. Ouellette placed plaintiff on medical detail, ordering that he not work effective November 25 through November 28, 2009. (ID#s 452-53).

Nurse Bastien examined plaintiff on November 28, 2009. He reported that he was "in the yard and started feeling shaky, light-headed." Plaintiff reported that he "told the officer I needed to go to HC [health care]." (ID#s 455-56).

### C. The December 2, 2009 Incident

The incident on which the present lawsuit is based occurred on December 2, 2009, four days after P.A. Ouellette had allowed plaintiff to return to work. Plaintiff was assigned to a public work crew supervised by defendant Kast. Plaintiff had been on Kast's crew for approximately two weeks before this incident. (Davis Dep. at 36, ID# 277). That day, the crew was working in a cemetery, cutting grass and raking up leaves. (*Id.* at 35, ID# 276). Plaintiff was assigned to vacuum up leaves after they were raked into piles. (Davis Aff., ID# 373).

Just before lunch, plaintiff became dizzy. He attributed this to low blood sugar:

Q: So what happened?

A: At one point, I felt dizzy and I stopped and I went to Officer Kast and told him that my sugar was low and I needed a honey pack.

(Davis Dep. at 41, ID# 280).[3] Kast told Davis to sit in the van and wait for the crew's lunch break. (*Id.*). Davis ate lunch shortly thereafter, and then stopped feeling dizzy. (*Id.* at 42, ID# 281). After lunch, Officer Kast handed two honey packs to another inmate to give to plaintiff. (*Id.* at 43, ID# 282). Plaintiff ate the honey, but by that time was already feeling better. He then finished the rest of his shift. (*Id.* at 44-45, ID#s 283-84).

---

[3] It is undisputed that Corrections Officers carried honey packs to give inmates with diabetes in case they suffered an episode of low blood sugar while performing their work duties. (Plf. Brief at 3, n.3, ID# 369).

Upon returning to the prison, Kast prepared a "Prisoner Accident Report." (ID# 411). The report recited only that plaintiff "stated he was feeling weak due to low blood sugar. Davis given two packs of honey for possible low blood sugar." Over plaintiff's signature, the following appears: "I felt weak and like my sugar was low and ask Kast for honey pack." Plaintiff testified that Kast told him he had to sign the paper and that he told plaintiff what to write. (Davis Dep. at 46, ID# 285).

Plaintiff was escorted to the Health Clinic, where he met Sgt. DeKlein and the Health Unit Manager, to whom plaintiff refers in his deposition as "Nurse HUM." (Davis Dep. at 49, ID# 286). DeKlein gave a nurse the accident report. (DeKlein Dep. at 33, ID# 259). The nurse checked plaintiff's blood sugar, which was about 150, which he understood to be in the normal range. (*Id.* at 51, ID# 287). A contemporaneous progress note by P.A. Ouelette reflects that plaintiff was informed by the Health Unit Manager that "he will not be able to work on PW [Public Works program] due to risk of injury." P.A. Ouelette indicated that she agreed with that plan. (ID# 460). The unit officer, a male, delivered the message to plaintiff that he was being removed from the Public Works unit. (Davis Dep. at 57, ID# 288). Within a month, plaintiff was offered new employment in a porter position. (*Id.* at 59, ID# 289).

The Health Unit Manager who saw plaintiff on December 2, 2009, was Maryann Schorfhaar. She testified that the Classification Director was the only person with responsibility to remove an inmate from a particular job assignment. (Schorfhaar Dep. at 17-20, ID#s 310-11). The Medical Department would provide information to the Classification Director, including providing a medical clearance. The Health Unit Manager's role was to act as a liaison between the medical staff and the Classification Director in this respect by use of the appropriate form. (*Id.* at 20-21, ID#

311). On December 2, 2009, Schorfhaar happened to be in the unit when plaintiff was brought in for an examination after the incident in the field. She questioned him about what he had eaten that morning. Plaintiff told her that he had a muffin, which Nurse Schorfhaar told him was not enough to sustain him. Plaintiff began to argue with her saying that he did not have to do anything he did not want to do. (*Id.* at 38-39, ID# 312). She testified that this incident caused a re-evaluation on the Health Unit concerning the wisdom of sending out insulin-dependent diabetics on the Public Works program. "The ultimate outcome was that we didn't send out insulin-dependent diabetics out after that. They were given other jobs, the opportunity for other jobs." (*Id.* at 40-41, ID# 312). This decision took some time to implement, as both the Classification Director and the Deputy Warden had to be involved. (*Id.* at 41).

The record is devoid of evidence that Officer Kast, the only remaining defendant in this case, had any ability to decide whether plaintiff was to continue in the Public Works program, or had any influence on that decision. The unrebutted testimony is that the decision was made by the Classification Director, in consultation with Health Unit Manager Schorfhaar. Nurse Schorfhaar testified that she did not know at the time that plaintiff was a homosexual and that this information would not normally be reflected in the medical file. (Schorfhaar Dep. at 51-52, ID# 313).

## Discussion

The only remaining claim in this case is that Officer Kast "sought to terminate Davis from the Public Works crew based on Davis's sexual orientation." (Brief at 5, docket # 69, ID# 371). The parties agree that discrimination against a person on the basis of homosexuality can violate the Equal Protection Clause of the Fourteenth Amendment. *See Davis v. Prison Health Servs.*, 679 F.3d 433, 438-39 (6th Cir. 2012). The parties disagree as to the level of scrutiny that

should be applied to discrimination on account of sexual orientation. This issue, however, is beside the point. Kast denies that he took any action against plaintiff on account of his sexual orientation. Therefore, this is not a case in which a state actor is called upon to justify disparate treatment of a person on account of a protected classification. Rather, the question is whether plaintiff has established that his removal from the Public Works job was in any way caused by a discriminatory act by Kast, in violation of the Equal Protection Clause.

An equal protection claim under the Fourteenth Amendment requires a state actor's intentional discrimination because of the plaintiff's membership in a protected class. *McCleskey v. Kemp*, 481 U.S. 279, 292 (1987). Regardless of the alleged basis of the alleged discrimination (whether race, national origin, or some other attribute), a plaintiff presenting an equal protection claim must establish it either by direct evidence of discrimination or by a establishing a *prima facie* case of discrimination under the burden-shifting scheme set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Arendale v. City of Memphis*, 519 F.3d 587, 603 (6th Cir. 2008) (discrimination under section 1983 is proved through the *McDonnell Douglas* framework); *accord Umani v. Mich. Dep't of Corr.*, 432 F. App'x 453, 458 (6th Cir. 2011) (applying *McDonnell Douglas* framework in section 1983 action by prisoner alleging termination from prison employment on account of race).

A. **Direct Evidence**

Direct evidence of discrimination requires the fact finder to draw no inference in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected group. *See Johnson v. Kroger Co.*, 319 F.3d 858, 865 (6th Cir. 2003). Direct evidence can be supplied by blatant remarks, disclosing a clear intent to discriminate

on the basis of some impermissible factor. Isolated or ambiguous comments, by contrast, are insufficient to support a finding of direct discrimination. *See White v. Columbus Metro. Hous. Auth.*, 429 F.3d 232, 239 (6th Cir. 2005). I assume, without deciding, that the alleged anti-homosexual slurs voiced by defendant Kast, if accepted by the trier of fact, could constitute direct evidence of discrimination.

The problem in this case, however, is that plaintiff has adduced no evidence that Kast made or even influenced the decision to remove plaintiff from the Public Works job. The Sixth Circuit consistently holds that no matter how offensive a statement may be, to qualify as direct evidence of discriminatory intent, "it must have been made by a person with decision-making authority." *Umani*, 432 F. App'x at 459; *accord Smith v. Leggett Wire Co.*, 220 F.3d 752, 759 (6th Cir. 2000) (racial comments made by persons who did not terminate plaintiff were not direct evidence of discriminatory intent); *Bush v. Dictaphone Corp.*, 161 F.3d 363, 369 (6th Cir. 1998) (statements by non-decisionmakers do not suffice to satisfy plaintiff's burden of demonstrating discriminatory animus); *McDonald v. Union Camp Corp.*, 898 F.2d 1155, 1161-62 (6th Cir. 1990) (statements of intermediate level management officials were not indicative of discrimination where the ultimate decision to discharge is made by an upper-level official).

In the present case, there is no evidence that Kast had the authority to remove plaintiff from his prison job or even to suggest removal. The unrebutted evidence is that such decisions are made by the Classification Director, with input from the medical staff concerning an inmate's medical condition. All Kast is alleged to have done was to have plaintiff file an accident report, containing the true statement that plaintiff told him that he became dizzy because of low blood sugar. A discriminatory statement by a person who does not have formal firing authority, but who has

"enormous influence in the decision-making process" can constitute evidence of discrimination. *Umani*, 432 F. App'x at 459. This exception cannot possibly apply to the facts of this case, as there is no evidence to support a finding that Kast had any influence, let alone "enormous influence," regarding removal of plaintiff from his position.

The recent *Umani* decision of the Sixth Circuit, although unpublished, is directly on point and persuasive. *Umani* also involved a claim that an inmate was fired from his prison employment on account of an unconstitutional factor, in that case race. One of the defendants made some clearly racist statements, but the court found that those statements could not constitute direct evidence of discrimination, because only the Classification Director had authority to terminate an inmate's employment. 432 F. App'x at 459. Similarly, the statements allegedly made by Kast, although reprehensible, cannot be deemed direct evidence of discrimination in the circumstances of this case, for lack of proof that Kast had even a scintilla of decision-making authority with regard to plaintiff's employment.

**B.** *Prima Facie* **Case**

In the absence of direct evidence of discrimination, a plaintiff must establish a *prima facie* case of discrimination in violation of equal protection rights by use of the *McDonnell Douglas* analysis. Under the *McDonnell Douglas* burden-shifting analysis, a plaintiff must show (1) that he is a member of a protected group, (2) that he was subject to an adverse employment decision, (3) that he was qualified for the position, and (4) that he was replaced by a person outside of the protected class or was treated differently from similarly situated members of the unprotected class. If plaintiff establishes a *prima facie* case, the burden shifts to defendant to articulate "some legitimate

nondiscriminatory reason" for his action. Plaintiff then has the burden of showing that the purported reasons were pretextual. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981).

Plaintiff's proofs are clearly sufficient to show that he was a member of a protected group and that he was subject to an adverse employment decision. It is debatable whether he was qualified for the position, in light of his medical history and the testimony of Nurse Schorfhaar, but I will assume for present purposes that he can meet the third prong. Plaintiff's *prima facie* case, however, falters on the fourth necessary showing. There is no evidence that plaintiff was treated differently from similarly situated non-homosexual inmates. In other words, plaintiff has not shown that any other inmate suffered a dizzy spell (or any similarly serious health problem) on a Public Works job which Kast did not report to prison authorities. Again, the only allegedly discriminatory act by Kast was his decision to file a truthful accident report reflecting plaintiff's dizzy spell and request for a honey packet. Plaintiff has not established that any other inmate, homosexual or not, suffered a similar health problem on the job that Kast decided not to report. Likewise, plaintiff has not established that Kast was replaced by a non-homosexual inmate after his removal from the Public Works program. The controlling Sixth Circuit authority requires that plaintiff identify at least one comparative employee who dealt with the same supervisor, was subject to the same standards and engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish his conduct or his employee's treatment for it. *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998). Plaintiff simply has not done so in this case, and his *prima facie* case of discrimination fails.

C.     **Causation**

Even assuming that plaintiff had established either direct or *prima facie* evidence of discrimination, no reasonable jury could ever find that defendant Kast caused plaintiff to lose his prison job. Proximate causation is a necessary element of any claim under section 1983. Under the proximate cause doctrine, an actor is liable for any consequence that he caused in fact, even if done by a third party, as long as the consequence was reasonably foreseeable. *See King v. Zamiara*, 680 F.3d 686, 695 (6th Cir. 2012). For example, a prison officer who starts the process for a transfer on account of retaliatory motive can be liable, even though the ultimate transfer must be approved by a superior. *See King*, 680 F.3d at 697-99; *accord Siggers-El v. Barlow*, 412 F.3d 693, 701-02 (6th Cir. 2005).

In the present case, however, Kast did not file the initial paperwork to remove plaintiff from his prison job. All Kast did was to file an accident report reflecting that plaintiff felt dizzy and was given a honey packet. The report is indisputably true, as plaintiff testified that he "went to Officer Kast and told him that my sugar was low and I needed a honey pack." (Davis Dep. at 41, ID# 280).[4] Plaintiff asserts that Kast somehow knew that the filing of this accident report would result in plaintiff's loss of his job, but that assertion is supported by no evidence. Not one of the witnesses in this case testified that a single low blood sugar incident would inevitably, or even possibly, lead to loss of prison employment. In fact, there is no evidence that Kast had any discretion

---

[4] At oral argument, plaintiff's counsel asserted that plaintiff has now changed his mind about this testimony and now claims that he did not tell Kast that he was suffering from low blood sugar. A party, however, is not allowed to recant sworn deposition testimony at the summary judgment stage. *See Reid v. Sears, Roebuck & Co.*, 790 F.2d 453, 460 (6th Cir. 1986); *see also Robbins v. Saturn Corp.*, No. 07-5280, ___ F. App'x ___, 2013 WL 4792877, at * 6 (6th Cir. Sept. 9, 2013) ("A party may not create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts his earlier deposition testimony.").

to file or not file an accident report. All the evidence is to the contrary. Health Unit Manager Schorfhaar, who had never met plaintiff before and did not know that he was a homosexual, testified that prison policy required officers to report incidents of low blood sugar suffered by inmates. (Schorfhaar Dep. at 35-36, ID# 392). "[W]e need to see them back in the clinic." (*Id.* at 36, ID# 392).

This is not a case like *Siggers-El*, on which plaintiff principally relies. In *Siggers-El*, the defendant chose to subject plaintiff to a security screen, allegedly for retaliatory reasons. The defendant argued that the ultimate decision to transfer the plaintiff could not be imputed to the defendant, because the transfer was subject to approval by the defendant's supervisor. The court held that plaintiff had shown sufficient causation, because the security screen "would lead inexorably to a transfer." 412 F.3d at 701. In the present case, there is no evidence that Kast had any discretion to report or not report plaintiff's admitted low blood sugar incident, nor is there any evidence that the report would lead inexorably to plaintiff's removal from his Public Works employment.

In this regard, plaintiff argues that there is no evidence that he "conclusively" suffered low blood sugar on December 2, 2009, and that Kast "created the issue of low blood sugar" to justify firing him. This argument is just that -- an argument -- and is supported by no evidence. By plaintiff's own admission (Davis Dep. at 41, ID# 280), he *told* Kast that he was suffering from low blood sugar. No trier of fact could conclude that Kast "created" the incident. Second, plaintiff seems to be saying that a prison guard should not report a prisoner's serious health complaint to competent medical authorities unless the guard "conclusively" knows that the complaint is valid. This argument is unsupported factually, as the prison's policy *required* guards to report incidents of low blood sugar. Legally, that argument is indefensible. How is a prison guard to confirm the merit

of a health complaint unless by reporting it to medical professionals? A guard who takes it upon himself to decide that a low blood sugar episode was not "conclusive" enough to report courts a deliberate indifference claim.

Any rational trier of fact viewing the evidence of record would conclude that the only cause for plaintiff's removal from his Public Works position was his uncontrolled diabetes. Plaintiff had been in and out of the health clinic on almost a daily basis for the two-month period preceding December 2, 2009. His diabetes was poorly controlled, and he had complained to the health care staff on numerous occasions concerning the physical effects of his diabetic condition. He had just come off a three-day medical detail (ID#s 452-54), after which he reported a similar dizzy spell to a prison nurse. (ID#s 455-56). This was November 28, only four days before the incident in question. By his own admission, plaintiff suffered a dizzy spell while hours away from the prison. When this situation came to the attention of the medical staff, they decided that he was not medically fit for the assignment and so notified the Classification Director. The only role played by Kast was that of messenger. The fact that this incident caused prison authorities to change their policies so as to prohibit insulin-dependent diabetics from participating in the Public Works program is clear evidence that plaintiff's diabetic condition, and not any discriminatory animus on the part of Kast, was the sole cause of the loss of his prison job. Although plaintiff now argues that his medical condition did not justify removal from the Public Works position, Kast clearly had nothing to say about that medical judgment.

Plaintiff has not established either direct or circumstantial evidence of intentional discrimination, nor could any rational trier of fact conclude that the decision of Officer Kast to file a truthful report concerning plaintiff's low blood sugar episode was the proximate cause of the loss

of his prison job. Officer Kast, the only remaining defendant in this case, is entitled to summary judgment on plaintiff's damage claim for violation of his equal protection rights.

### Recommended Disposition

For the foregoing reasons, I recommend that the motion of Officer Kast for summary judgment (docket # 57) be granted.


Dated: December 3, 2013                 /s/ Joseph G. Scoville
                                        United States Magistrate Judge


### NOTICE TO PARTIES

Any objections to this Report and Recommendation must be filed and served within fourteen days of service of this notice on you. 28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b). All objections and responses to objections are governed by W.D. MICH. LCIVR 72.3(b). Failure to file timely and specific objections may constitute a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Keeling v. Warden, Lebanon Corr. Inst.*, 673 F.3d 452, 458 (6th Cir. 2012); *United States v. Branch*, 537 F.3d 582, 587 (6th Cir. 2008). General objections do not suffice. *See McClanahan v. Comm'r of Social Security*, 474 F.3d 830, 837 (6th Cir. 2006); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596-97 (6th Cir. 2006).